**In re H. Keith HENSON, Debtor.**

No. 98–51326–ASW.

United States Bankruptcy Court,
N.D. California.

Feb. 7, 2003.

Stanley A. Zlotoff, Esq., Law Offices of Stanley A. Zlotoff, San Jose, CA, for Debtor.

Elaine M. Seid, Esq., McPharlin Sprinkles Thomas, Thomas R. Hogan, Esq., Law Offices of Thomas R. Hogan, San Jose, CA, Helena K. Kobrin, Esq., Moxon & Kobrin, Los Angeles, CA, Samuel D. Rosen, Esq., Paul Hastings Janofsky Walker, New York City, for Religious Technology Center.

## MEMORANDUM DECISION CONVERTING CASE TO CHAPTER 7

ARTHUR S. WEISSBRODT,
Bankruptcy Judge.

Before the Court are two matters initiated by Religious Technology Center ("Creditor"), a creditor of H. Keith Henson ("Debtor"), who is the debtor in this Chapter 13 [1] case:

1/ A motion to dismiss the Chapter 13 case with prejudice, alleging that Debtor filed his bankruptcy case in bad faith.[2]

2/ An objection to confirmation of Debtor's Chapter 13 Plan, alleging that the Plan has been proposed in bad faith, is not feasible, fails to treat unsecured

---

1. Unless otherwise noted, all statutory references are to the Bankruptcy Code, Title 11 United States Codes, as it provided with respect to cases commenced on February 23, 1998, when Debtor filed the Chapter 13 petition in this case.

2. Creditor's motion originally sought alternative relief in the form of either dismissal with prejudice or conversion to Chapter 7, but the request for conversion was withdrawn on August 14, 2002.

creditors as well as they would be treated under Chapter 7, and does not include all disposable income.

Creditor is represented by Elaine M. Seid, Esq. of McPharlin, Sprinkles & Thomas LLP; Thomas R. Hogan, Esq. and Leslie Holmes, Esq. of the Law Offices of Thomas R. Hogan; Samuel D. Rosen, Esq. of Paul, Hastings, Janofsky & Walker LLP; and Helena K. Kobrin, Esq. of Moxon & Kobrin. Debtor is represented by Stanley A. Zlotoff, Esq. ("Zlotoff"). Debtor's wife, Victoria Arel Lucas ("Lucas"), was represented during the latter part of the trial by Howard Hibbard, Esq.

Creditor's motion and objection were consolidated for trial; trial has been concluded and the matters have been submitted for decision. This Memorandum Decision constitutes the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure ("FRBP").

## I.

### FACTS

It is undisputed that Debtor left California to live in Canada at some point during 2001, shortly prior to being sentenced on criminal charges in Riverside County. Debtor stated in a pre-trial declaration that he had filed a petition for Canadian refugee status and could not leave that country while it was pending, and he filed a motion for leave to appear at trial by "contemporaneous video transmission" because he had moved to Canada and would "likely still be there" at time of trial. Debtor's motion was denied for lack of the "good cause" and "compelling circumstances" that are required by Rule 43(a) of

the Federal Rules of Civil Procedure (incorporated by FRBP 9017).

The only witness at trial was Lucas, called by Debtor (Lucas is not a joint debtor in this bankruptcy case). Both parties introduced documents into evidence, including copies of messages posted on the Internet by Debtor, excerpts from transcripts of examinations taken of Debtor and Lucas under FRBP 2004, copies of documents filed in the bankruptcy case, and copies of documents filed in other courts—Creditor also introduced excerpts of Debtor's videotaped deposition taken by Creditor in 1996 during other litigation. Most of the salient facts are undisputed, although the parties disagree as to how they should be interpreted.

Debtor stated in a declaration filed August 31, 2000 that he was then 58 years old.

Debtor has been an outspoken critic of the Church of Scientology since at least 1995. He and his wife clearly believe that the Church is harmful and vindictive in general, and has behaved that way with respect to them in particular. Debtor's public criticism of the Church has taken the form of standard political action such as picketing, as well as publishing Debtor's critical views of the Church, its leaders, and at least one of its lawyers on the Internet.[3] Debtor and some of his colleagues also play a form of game in which they rate among themselves the negative reactions they evoke from Church officials and lawyers.

Creditor and its lawyers strike at Debtor with a force and with resources that far exceed those available to Debtor (e.g., the four different law firms who represent and appear for Creditor in this Chapter 13

---

**3.** The Court does not suggest that any particular act of Debtor falls within, or exceeds, lawful political conduct. However, at least one of Debtor's Internet postings has been held to constitute a willful copyright infringement, as noted herein.

bankruptcy), appearing to expend funds that significantly exceed those expended on any Chapter 13 case of which this Court is aware, and far beyond the financial issues at stake. Moreover, the character of the litigation has been highly contentious and personal, unlike most Chapter 13 practice.

Debtor testified in a 1996 videotaped deposition, before commencement of this bankruptcy case, that he had never been a member of the Church, but had participated since at least 1995 in a group known as "alt.religion.scientology", or "a.r.s.", which was critical of the Church. The group awarded its members different levels of "status" depending on what kind of response was evoked by their acts toward the Church—e.g., greater status was achieved by being sued for copyright infringement than by being sent "cease and desist" letters. Debtor said in the 1996 deposition that he had made many[4] postings on the Internet that were "critical or taunting" toward the Church, and considered eliciting responses to be "a major increment in status" within a.r.s., as well as "a great game", "extremely amusing", "screamingly funny", "a lot of fun", among his "hobbies", and an activity that "comes off the recreation budget".

In April 1996, Creditor sued Debtor in the United States District Court for the Northern District of California, alleging that Debtor had infringed Creditor's copyright by posting copies of certain works on the Internet. In April 1997, Creditor received summary judgment finding infringement by Debtor, and a permanent injunction was issued prohibiting further infringement. The issue of whether Debtor's infringement was willful was set for a jury trial scheduled to begin on December 1, 1997, which was continued by the District Court *sua sponte* to February 24, 1998; Debtor requested three further continuances, which were not granted. Debtor filed his Chapter 13 petition the day before trial was set to commence. Under Debtor's signature on the petition, the date "December 1, 1997" is typed but crossed out with a handwritten line, and "Feb 23, 1998" is handwritten next to it.[5]

Two days after filing bankruptcy, Debtor posted a message on the Internet saying that he was prepared to violate the permanent injunction issued by the District Court. Creditor sought and received relief from the automatic stay of § 362(a) in this Court, for the limited purposes of seeking further injunctive relief in the District Court to prevent Debtor from carrying out his stated intention, and also to liquidate Creditor's claim by proceeding to trial in the District Court. Creditor set a FRBP 2004 examination of Debtor for March 24, 1998, but Debtor filed a "withdrawal" of his Chapter 13 petition on the morning of that day.

On May 12, 1998, the District Court jury found that Debtor's infringement was willful and awarded Creditor damages of $75,000. Debtor was the only witness at trial—when asked whether he would infringe Creditor's copyright again, he replied "At least I wouldn't do it openly".

Debtor's "withdrawal" of his bankruptcy petition was not treated by the Clerk of this Court as a dismissal of the case under § 1307, so the case remained pending. On

---

4. Debtor testified that he did not know how many such postings he had made on the Internet. When asked a second time by counsel for Creditor to make an estimate, Debtor replied in a facetious tone that the number was 1,228.

5. Debtor's Chapter 13 petition names no attorney of record in the bankruptcy case. Graham Berry ("Berry") substituted in as attorney of record on March 23, 1998, and was replaced by Zlotoff on August 5, 1998.

April 24, 1998, the Chapter 13 Trustee sought dismissal for Debtor's failure to appear at the creditors' meeting required by § 341 and/or to make the first payment due under his proposed Chapter 13 Plan; an order of dismissal was filed on April 28, 1998 and the case was closed by the Clerk on May 19, 1998. On June 9, 1998, Creditor recorded an abstract of its District Court judgment. On July 13, 1998, Debtor moved to have the dismissal order vacated and the case "reinstated", saying that he had retained bankruptcy counsel and needed bankruptcy relief because of Creditor's judgment against him—on July 20, 1998, an order was issued, providing that the case was "reinstated prospectively".

Creditor promptly objected to confirmation of Debtor's proposed Chapter 13 Plan and then moved to have the case dismissed with prejudice, or converted, due to bad faith. There ensued discovery disputes that continued for over two years, including numerous motions to compel from Creditor and several motions by Debtor for protective orders. Each of Creditor's motions was granted to some extent, only to be followed by more motions complaining that Debtor and/or Lucas had not fully complied with orders compelling them to produce documents or answer questions. Discovery finally appeared to be complete by March 2001, until Creditor sought additional discovery in April 2002 based on the changed circumstances of Debtor having moved to Canada (which request was granted in part over Debtor's objection). Throughout these controversies, Creditor accused Debtor and Lucas of "stonewalling", while Debtor and Lucas accused Creditor of "harassing" them and others— *e.g.*, Creditor complained that Debtor and Lucas deliberately failed to keep financial records of cash transactions and to file tax returns so that Creditor could not make use of such material; *e.g.*, Debtor and Lucas complained that, whenever Creditor was able to learn who their clients and employers were, Creditor picketed and intimidated those people.[6]

Debtor filed his Chapter 13 petition in "skeleton" form, *i.e.*, without the Schedules of Assets and Liabilities, Statement of Financial Affairs, and Chapter 13 Plan required by the Bankruptcy Code and Rules; he filed those documents on March 10, 1998. They are handwritten and show as follows:

Schedule A states that Debtor's interest in real property consist of a residence worth $322,500 that he owns "jointly" with Lucas.

Schedule B states that Debtor holds interests in personal property totaling $10,300 (which are not shown to be held with Lucas), consisting of the following:

1/ Savings and checking accounts at Wells Fargo Bank worth "$1,500.00";

2/ Household goods at the residence worth "$1,000.00";

3/ Books at the residence worth either "$5100.00" or "$5,00.00", depending on whether the mark after the "$5" is a numeral one or a comma (a value of $500.00 would be consistent with the total stated);

---

6. Lucas testified at trial that there were fifteen or twenty or more instances of picketing at her home and place of employment in 2000, "every day for a few weeks" or "all summer". Although she was convinced that the picketers were Scientologists (and no other reason for her to be picketed was mentioned by either side), it was not established that the picketing was done by members of the Church of Scientology or by Creditor. She also testified that she had picketed Church facilities including a southern California "paramilitary compound" with armed guards, and Debtor testified in a FRBP 2004 examination that he spent part of some 200 days post-petition picketing Church locations across the country.

4/ Wearing apparel at the residence worth either "$3100.00" or "$3,00.00", depending on whether the mark after the "$3" is a number one or a comma (a value of $300.00 would be consistent with the total stated);

5/ A firearm at the residence, worth either "$1100.00" or "$1,00.00", depending on whether the mark after the "$1" is a number one or a comma (a value of $100.00 would be consistent with the total stated);

6/ An IRA account worth "$4,000.00";

7/ "Zero percent value in three (3) companies—names can be given only in Court (in Camera)";

8/ Six patents with "zero value";

9/ A 1986 Oldsmobile worth "$2,000.00";

10/ A "DIS" personal computer worth "$9100.00" or "$9,00.00", depending on whether the mark after the "$9" is a number one or a comma (a value of $900.00 would be consistent with the total stated).

Schedule B states that Debtor holds no interests in cash, security deposits, furs and jewelry, insurance policies, annuities, partnerships or joint ventures, bonds, accounts receivable, support or property settlements, other liquidated claims, equitable or future interests, decedents' estates, contingent or unliquidated claims of any kind, general intangibles including licenses or franchises, boats and accessories, aircraft and accessories, machinery or equipment, business supplies, inventory, animals, crops, farm equipment and supplies, or any other personal property not listed.

Schedule C claims exemptions for the real property, bank accounts, household goods, books, firearm, IRA account, automobile, and computer.

Schedule D states that the only secured creditor is the holder of a $256,200 deed of trust on the residence.

Schedule E states that Debtor may owe priority tax claims of unknown amounts to the California State Franchise Tax Board and the Internal Revenue Service.

Schedule F states that Debtor has no creditors holding unsecured nonpriority claims.

Schedules G and H state, respectively, that Debtor has no executory contracts or leases, and no co-debtors.

Schedule I contains no answers to the questions about Debtor's spouse or dependents, and states that he has been a self-employed "computer consultant" since 1985, with estimated monthly income of $5,000 gross and $3,500 net.

Schedule J lists monthly expenses totaling $5,832, states that the monthly difference between income and expenses is a negative $832, and calls for $75 per month to be paid to the Chapter 13 Trustee.

The Chapter 13 Plan is a printed form other than that used in this District, identifying the Bankruptcy Court as being in the Central District of California. It contains two handwritten entries saying that Debtor will pay the Chapter 13 Trustee $75 per month for 48 months, and none of the other information requested has been provided.

The Statement of Financial Affairs shows all questions answered "none" except the following:

1/ Gross income of $130,000 in 1997 and $75,000 in 1996, from "Self Employment".

2/ Pending copyright infringement lawsuit by Creditor against Debtor with potential liability of $1,000,000.

3/ Debtor's former address.

4/ Location of Debtor's business.

Debtor acknowledged in a FRBP 2004 examination that he signed the Schedules, Statement of Financial Affairs, and Plan. However, he also said that the forms were completed by a member of Berry's staff in Los Angeles using some information supplied by Debtor over the telephone, and "a lot of the entries were made just from standard tables that they use". Debtor also said: he did not review the completed forms before signing them and "I don't know that I ever looked at those schedules"; "what's on them is as much of a guess to me as anybody else"; "I don't deal with our finances, and so those were off-the-top-of-my-head guesses"; "just wild-assed guesses"; "it may not be at all accurate"; but the information was supplied "[t]o the best of my ability". In contrast to Debtor's description of the information in the Schedules, Lucas testified at trial that she recalled Debtor spending evenings for three or four days working on the forms at their dining room table, asking her for information as he went along, and seeming "agitated". Lucas also said that the forms were completed in Debtor's handwriting, though she thought the writing looked "strange"—upon hearing Debtor's deposition testimony that the forms were filled out by Berry's employee, Lucas said that she must have been mistaken.

Lucas' testimony at trial about the contents of the Schedules was inconclusive at best. She acknowledged that she and Debtor had been married since 1982, but said that, at least since they had been engaged in struggles with the Church, the couple purposely kept their business and financial affairs separate and did not disclose information to each other, in order to shield Lucas from Creditor—as a result, she lacked personal knowledge of many things that a wife might be expected to know about her husband's property. For example, she expressed ignorance about the extent or value of Debtor's books and computers as they existed on the date of bankruptcy, knew only that she had recently been packing whatever Debtor left behind when he went to Canada, and had no reliable basis upon which to value that. Further, Creditor learned in discovery that Debtor had a safe and 300–400 pounds of copper in the backyard, but Lucas claimed to know only that she had arranged for a safe to be moved, did not know what the contents were, was unaware of any copper, and did not know what was in "all of the boxes" in the yard. With respect to Debtor's income and the family's expenses, Lucas said that she either did not know or did not remember enough to corroborate the information in the Schedules with much conviction. When asked to estimate the value of the couple's household goods and furnishings, Lucas surmised $500 but said that she was "just guessing" because she does not "buy things" and therefore has no way to know prices or values. To the extent that Lucas did have, or purported to have, some personal knowledge, her testimony was sometimes clear and straightforward, but was also sometimes inconsistent. For example, Creditor had learned in discovery that the couple possessed and insured some art work that is not disclosed in the Schedules—at different points during the trial and in FRBP 2004 examinations, Lucas claimed that her former husband had given the art work to her for use in a business, that he had given it to her for her daughter before Lucas was pregnant, that he had given it to her for the child while Lucas was pregnant, and that he had given it to her for the child after the birth. Creditor had also learned in discovery that Debtor was insured by a life insurance policy with cash surrender value, which is not listed in the Schedules—Lucas testified at trial that it was a joint policy

covering both spouses "to insure our cryonic suspension at our deaths", which they both "gifted to" the Alcor Life Extension Foundation; however, the document in evidence showed that the policy insures only Debtor, and Lucas testified in a FRBP 2004 examination that each spouse had a separate policy and she knew nothing about Debtor's. Lucas testified that she did have personal knowledge about bank accounts and credit cards and said that there were more of those than disclosed by the Schedules.

After Debtor became represented by Zlotoff, some amendments were filed on August 5, 1998, as follows:

Schedule F was amended to include as unsecured nonpriority creditors Berry and Creditor's attorneys.

Schedule I was amended to show that Debtor was married and had a 15 year old dependent daughter—Debtor's monthly income from self-employment as a "consultant (independent contractor)" is shown to be $4,200 gross and net, and Lucas' monthly income as an "information specialist" employed by EBSCO is shown to be $2,513 gross and $1,855 net, for total net monthly income of $6,055.

Schedule J was amended to list expenses totaling $5,904, with monthly disposable income of $151 available for payments into the Chapter 13 Plan.

The Chapter 13 Plan was amended to provide for monthly payments to the Trustee of $150 for 42 months, with a 4% dividend paid to unsecured nonprior-

ity creditors after full payment of all administrative and priority claims; it refers to no secured creditors.

The Chapter 13 Plan was then amended three more times, as follows:

On December 24, 1998, it was amended to provide for monthly payments to the Trustee of $50 for eight months, followed by $150 per month "until all allowed claims are paid", with a 4% dividend paid to unsecured nonpriority creditors after full payment of all administrative and priority claims; it refers to no secured creditors.

On August 27, 2002, it was amended to provide for monthly payments to the Trustee of $150 for an unstated period of time, with a 0% dividend paid to unsecured nonpriority creditors after full payment of all administrative and priority claims; it refers to no secured creditors.

On October 7, 2002, it was amended to add Creditor as the holder of a claim secured by a "judicial lien" on Debtor's residence—the value of the real property is stated as $410,000 on the date of bankruptcy, with Debtor holding a 50% joint tenancy interest worth $205,000— the value of Creditor's lien is stated as $2,000, and the Plan provides for the lien to be avoided under § 522(f) as an impairment of Debtor's homestead exemption.

At trial, Zlotoff stated that the amended Plans filed in 2002 were based on conflicting information about whether Creditor had a secured or unsecured claim,[7] and

---

7. Creditor has filed three proofs of claim: the first is in the amount of $1,060,636.86 filed on September 9, 1998, described as an unsecured nonpriority claim based on "Judg, Costs, Fees, Sanctions"; the second is in the amount of $222,651.83 filed on September 9, 2002, stating that it amends the first, and described as an unsecured nonpriority claim

based on "Judg, Costs, Fees, Sanctions"; the third is in the amount of $222,651.83 filed on October 3, 2002, stating that it amends the first and second, described as a secured claim "at least to the extent of" $75,000 based on Creditor's recorded abstract of judgment and Debtor's residence, and further described as

that those amendments had been or would now be withdrawn, so that the amended Plan filed on December 24, 1998 was the Plan being proposed for confirmation. However, Zlotoff acknowledged that, if Creditor does hold a secured claim, the December 24, 1998 Plan would not be confirmable as a matter of law because it does not provide for such a claim, as is required by § 1325(a)(5). Zlotoff noted that the status of Creditor's claim has not been presented for decision, and it remains to be determined whether Creditor holds a secured claim by virtue of having recorded an abstract of the District Court judgment after the bankruptcy case was dismissed and before it was "reinstated prospectively", what the value of any secured claim would be under § 506(b) as measured by the value of Debtor's interest in the real property collateral, and whether any secured claim would be partly or fully avoidable under § 522(f) as an impairment of Debtor's homestead exemption. Zlotoff's position at trial was that, if the bankruptcy case is not dismissed or converted, Debtor will attempt to amend his Plan as necessary to be confirmable in light of how the issues concerning Creditor's claim are later determined.

## II.

### ANALYSIS

As noted above, Debtor does not now intend to seek confirmation of the current Plan until it has been determined to what (if any) extent Creditor's allegedly secured claim is allowed and unavoidable. Accordingly, Creditor's objection to confirmation of the existing Plan is premature, and what remains before the Court for decision is Creditor's motion to dismiss the bankruptcy case with prejudice as having been filed in bad faith.

being based on "Judg, Costs, Fees, Sanc-

### A. *Cause*

Involuntary dismissal of a Chapter 13 case is governed by § 1307(c), which provides in its entirety as follows:

(c) Except as provided in subsection (e) of this section [concerning farmers], on request of a party in interest or the United States trustee and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title, or may dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause, including—

(1) unreasonable delay by the debtor that is prejudicial to creditors;

(2) nonpayment of any fees and charges required under chapter 123 of title 28;

(3) failure to file a plan timely under section 1321 of this title;

(4) failure to commence making timely payments under section 1326 of this title;

(5) denial of confirmation of a plan under section 1325 of this title and denial of a request made for additional time for filing another plan or a modification of a plan;

(6) material default by the debtor with respect to a term of a confirmed plan;

(7) revocation of the order of confirmation under section 1330 of this title, and denial of confirmation of a modified plan under section 1329 of this title;

(8) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan other than completion of payments under the plan;

(9) only on request of the United States trustee, failure of the debtor to file, within fifteen days, or such additional time as the court may allow, after the

tions".

filing of the petition commencing such case, the information required by paragraph (1) of section 521; or

(10) only on request of the United States trustee, failure to timely file the information required by paragraph (2) of section 521.

In this case, Debtor has caused and continues to cause unreasonable and prejudicial delay. Chapter 13 is a means of reorganization for individuals with regular income, who can retain their property while paying creditors all disposable income and the value of their non-exempt assets over time. But Debtor's Schedules have been shown to be so unreliable that it cannot be ascertained with any reasonable certainty what his financial condition was on the date of bankruptcy five years ago, as is necessary for Chapter 13 relief. Debtor is not here to answer for the many discrepancies between his Schedules and his prior testimony, and Lucas has proven unable to furnish satisfactory explanations. It is clear that property interests revealed by discovery were not included in either the original or amended Schedules, such as art work possessed and insured by Debtor, several hundred pounds of copper, and a cash value life insurance policy that was "gifted" away—such omissions raise doubts about the true extent of Debtor's assets and whether additional property might exist that should have been scheduled but was not.[8] Similarly, the values of disclosed assets and the budget figures could not be verified at trial because Debtor was not present and Lucas lacked sufficient personal knowledge—that information cannot be taken from the Schedules at face value and presumed true because Debtor admitted in discovery that it was based "on off-the-top-of-my-head guesses" and "just wild-assed guesses". Even if Debtor were to file additional amendments now, that would not solve the problem, because he admitted in discovery that he signed the original Schedules and Statement of Financial Affairs without reading them, after giving his attorney information derived from "guesses" that "may not be at all accurate"—yet he signed those documents under penalty of perjury, so it is apparent that his signature under oath does not necessarily assure his careful attention to the detail required. Equally important, Debtor is unavailable now and is likely to remain so for the foreseeable future, so he is not available for cross-examination in any event. Therefore, he is simply not in a position to propose a confirmable Chapter 13 plan at this time.[9] That is delay prejudicial to creditors at the very least.

Since § 102(3) provides that the term "including" is not limiting, the list set forth at § 1307(c)(1)-(10) is a non-exclusive

---

8. Zlotoff argued at trial that those particular omissions were harmless because the Debtor's interest in the subject properties lacked value and/or was exempt. It is true that these are not large dollar items and there has been no proof of non-reporting of assets of major value. As is clear from Lucas' testimony, as inconsistent as it was, Debtor and Lucas have maintained a modest, frugal life style. But the point is that there should be no omissions in the first place, so that creditors, the Chapter 13 Trustee, and the Court can make their own decisions about the extent of a scheduled interest, its value, and whether it qualifies for exemption. Instead, Debtor's original and amended Schedules show only that, through carelessness, and possibly worse, Debtor did not carefully disclose all property interests as is required by the Code.

9. Creditor had moved for summary judgment on the ground that Debtor's absence precluded him from proving good faith as a matter of law, but Zlotoff argued that he could prove good faith through Lucas and other witnesses. Summary judgment was denied because the Court could not rule as a matter of law that good faith could not be shown by evidence other than a debtor's testimony.

one that does not define the term "cause" but merely illustrates examples of it. In the Ninth Circuit, an additional form of "cause" for involuntary dismissal consists of filing a Chapter 13 petition in bad faith, *see In re Eisen,* 14 F.3d 469, 470 (9th Cir.1994) (*"Eisen"*):

> A Chapter 13 petition filed in bad faith may be dismissed "for cause" pursuant to 11 U.S.C. § 1307(c) [citations omitted].... To determine bad faith a bankruptcy judge must review the "totality of the circumstances." *In re Goeb,* 675 F.2d 1386, 1391 (9th Cir.1982). A judge should ask whether the debtor "misrepresented facts in his [petition or] plan, unfairly manipulated the Bankruptcy Code, or otherwise [filed] his Chapter 13 [petition or] plan in an inequitable manner." *Id.* at 1390. "A debtor's history of filings and dismissals is relevant." *In re Nash,* 765 F.2d 1410, 1415 (9th Cir. 1985). Bad faith exists where the debtor only intended to defeat state court litigation. *In re Chinichian,* 784 F.2d 1440, 1445–46 (9th Cir.1986).

Creditor argues that Debtor's pre-petition and post-petition conduct show that he did not file bankruptcy for the good faith purpose of reorganizing his financial affairs in the face of Creditor's judgment, but for the bad faith purposes of thwarting the District Court trial, avoiding payment of a judgment that would be non-dischargeable in Chapter 7, imposing delay and expense upon Creditor, and generally proceeding with a malicious "overarching enterprise" and "unitary plan" against the Church.[10] It is clear that Debtor's conduct has not been exemplary, but it is equally clear that his behavior has largely been a reaction to what he perceives as provocation by Creditor or the Church.[11] Debtor and the Church have been engaged in battle since long before this bankruptcy case commenced, and the relationship has not improved. Debtor considers the Church a vindictive and punitive enemy and seems to respond defensively to everything that Creditor does, rather than treating his bankruptcy case as a business matter involving financial issues between a debtor and his creditors. For its part, Creditor may not have purposely fanned the flames of Debtor's emotional state, but the Court's 30 volume file of this case with 490 docket entries shows that Creditor has been zealous in pursuit of a remedy, including extensive discovery, an unsuccessful motion to recuse the undersigned, an unsuccessful motion to have the case dismissed under the fugitive disentitlement doctrine, an unsuccessful summary judgment motion, and numerous unsuccessful efforts to appeal, have writs issued, and

10. Creditor also argues that Debtor had no legitimate reason to think that he must resort to bankruptcy, because the Schedules show that he was solvent on the petition date, with equity in his home, annual income of $130,000, and no other creditors; according to Creditor, the maximum available penalty for willful copyright infringement is $100,000 (and only $10,000 for non-willful infringement) plus attorney's fees. Debtor argues that the residence is held in joint tenancy and is subject to Debtor's homestead exemption so there was no non-exempt equity, and Debtor's ability to earn was hampered by Creditor's intimidation of his clients. Regardless of what Debtor's assets and potential exposure to Creditor were on the petition date, insol-vency is not a condition of eligibility for bankruptcy. As discussed above, the Code's reorganization provisions, such as Chapter 13, permit retention of property while paying its non-exempt value over time, so as to avoid the sudden loss of assets that could befall a judgment debtor outside of bankruptcy. It is not bad faith to seek the relief that the Code makes available even to those who might be able to pay a judgment through immediate liquidation.

11. Creditor has drawn distinctions between those two entities in the past, but Debtor does not appear to recognize one.

have the District Court withdraw its reference of the case to the Bankruptcy Court. The attitude of both parties has been so antagonistic that it has not been conducive to the orderly maintenance of a Chapter 13 case, and both parties are somewhat (although not necessarily equally) responsible for the way in which this case has progressed. Debtor had good reason to file Chapter 13 in order to retain his home and other assets while dealing with Creditor's judgment in an orderly manner—if (as Debtor claims) his residence is held in joint tenancy and subject to a homestead exemption, there was little or no equity in that property and potential liability for Creditor's attorney's fees could have produced an exorbitant debt. The Court does not agree with Creditor's contention that there was no reason for Debtor to file bankruptcy, but it is true that some of his conduct (both pre-petition and post-petition) suggests that he pursued bankruptcy for the bad faith purpose of harming the Church and/or Creditor rather than in a good faith effort to reorganize his financial affairs—however, under the totality of the circumstances test, the context in which Debtor has acted also cannot be ignored. The fact is that a mutually combative atmosphere has persisted throughout this case, just as it did for years pre-petition, which has contributed to and influenced the manner in which Debtor has proceeded. Under such circumstances, the issue of whether Debtor filed bankruptcy in a good faith attempt to deal with his debts or in a bad faith attempt to hinder and impose upon Creditor is not a clearcut one. However, it is not necessary to find that Debtor filed bankruptcy in bad faith in order to conclude that cause exists to remove this case from Chapter 13, because Debtor has shown that he is not capable of performing as a Chapter 13 Debtor. Debtor has not provided reliable information about his financial condition, he will not make himself available to do so in future, and Lucas has been unable to do so in Debtor's absence. Cause therefore exists for concluding that this bankruptcy case cannot remain in Chapter 13.

### B. Dismissal or Conversion

■■■ Creditor originally sought to have the case dismissed with prejudice or converted to Chapter 7, but has withdrawn the latter request and now seeks only dismissal with prejudice.[12] However, as set forth above, § 1307(c) provides that the Court may convert or dismiss a case, "whichever is in the best interests of creditors and the estate"—as noted by *In re Staff Investment Co.*, 146 B.R. 256, 260 (Bkrtcy.E.D.Cal.1992) ("*Staff*") concerning the identical language of § 1112(b) that applies in Chapter 11 cases:

> A motion made under section 1112(b) gives the court the option of dismissing or converting, regardless of whether the motion itself seeks only dismissal or only conversion. Upon the requisite showing of cause under section 1112(b), it is up to the court to choose between dismissal or conversion, "whichever is in the best interest of creditors and the estate.".

Creditor contends that its interests would be better served by dismissal with prejudice than by conversion, and argues that it is the only creditor, citing a stipulation to that effect in a joint pre-trial statement. Zlotoff points out that he has a claim against the estate for administrative expenses in the form of his unpaid fees incurred as Debtor's attorney, and that the stipulation about creditors does not refer

---

12. The dismissal "with prejudice" is described by Creditor as Debtor being "barred from filing successive bankruptcy petitions in an attempt to discharge the debts that currently are pending in this case", including Creditor's judgment for willful infringement.

to administrative claimants such as himself. Zlotoff correctly notes that the term "creditor" is defined by § 101(10), as follows:

> (A) entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor;
>
> (B) entity that has a claim against the estate of a kind specified in section 348(d), 502(f), 502(g), 502(h) or 502(i) of this title; or
>
> (C) entity that has a community claim
>    . . . .

Zlotoff's claim for payment of his compensation as counsel for Debtor arose post-petition and is an administrative expense of the estate under § 503(b)(2), rather than the claim of one who is a "creditor" as defined by the Code; *see, e.g., In re Polysat, Inc.,* 152 B.R. 886, 895 (Bkrtcy. E.D.Pa.1993), citing § 101(10) and holding that an "administrative claimant technically is not a 'creditor' as defined by the bankruptcy code, and, therefore, is not required to file a proof of claim by virtue of Rules 3002 or 3003".

■ Creditor cites *"Staff"* for the proposition that the interests of the debtor are not among those to be considered under § 1112(b) or § 1307(c), which sections expressly address only the interests of creditors and the estate. In this case, such interests encompass those of Creditor, Zlotoff as the holder of a claim for administrative expenses of the estate, and any other creditors or administrative claimants. Despite the parties' stipulation (which was not approved by the Court) the Court's file shows that unsecured claims have been filed by Wells Fargo Bank ($2,051.32) and the Internal Revenue Service ($6,841.47, of which $6,225.72 is stated to be a priority tax claim); given the general unreliability of the Schedules, it may well be that other pre-petition creditors also exist, who were not scheduled and therefore have not filed claims. Moreover, Creditor has argued that Debtor may have been using credit cards post-petition rather than earning income and, if that is true, it is entirely possible that post-petition claims have been incurred by such use. Other creditors were not parties to the stipulation between Creditor and Debtor and are not bound by it, and the Court must consider their interests along with the interests of Creditor and Zlotoff.

If the case were dismissed with prejudice, Creditor, Zlotoff, Wells Fargo Bank, the Internal Revenue Service, and anyone else to whom Debtor incurred a pre-petition or post-petition debt would have to compete with each other for such assets as could be located (including whatever Debtor may have taken, or had sent, to Canada). However, if the case were converted to Chapter 7, § 348 would apply to provide that all pre-conversion creditors and claimants would receive whatever pre-conversion assets were available in an orderly distribution conducted by a professional Chapter 7 Trustee according to the priorities fixed by the Code. With respect to Creditor's judgment for willful infringement, Creditor has argued that such a claim would be non-dischargeable in Chapter 7 under § 523(a)(6)—that may or may not be so pursuant to recent caselaw such as *In re Jercich,* 238 F.3d 1202 (9th Cir. 2001) and *In re Su,* 290 F.3d 1140 (9th Cir.2002), but Creditor would have a chance to test its theory in Chapter 7 and, if successful, could pursue Debtor outside of bankruptcy just as if the case had been dismissed. Issues raised by Creditor about whether Debtor holds the residence in joint tenancy with Lucas and whether Debtor is entitled to a homestead exemption remain to be determined regardless of whether the case is dismissed or converted. Finally, a Chapter 7 Trustee could

754

apply § 547 and § 549 to avoid, respectively, any pre-petition preferential transfers and unauthorized post-petition transfers, which remedies are provided by the Code but not available to creditors outside of bankruptcy.

 As noted by *Staff* (at 260):

The standard for choosing conversion or dismissal based on "the best interest of creditors and the estate" implies a balancing test to be applied through case-by-case analysis. In the end, the determination is a matter for sound judicial discretion.

In this case, the interests at stake would be better served through conversion of the case for administration by a Chapter 7 Trustee than through dismissal of the case. Conversion will place the estate in the hands of an independent Court-appointed Trustee, preserve such assets as exist and allow for potential recovery of additional ones through use of avoiding powers, maintain the Code's priorities among creditors in an orderly distribution, and permit Creditor to seek exception of its claim from discharge to pursue Debtor outside of bankruptcy if it wishes to do so. On balance, that result is preferable to dismissal, which would leave all creditors and claimants to fend for themselves in State Court, with an absent Debtor and none of the avoiding powers provided by the Code. The reasons supporting conversion over dismissal are equally applicable regardless of whether the cause to remove the case from Chapter 13 is a bad faith filing, unreasonable and prejudicial delay, or any other form of cause.

## CONCLUSION

For the reasons set forth above, Creditor's motion to dismiss this Chapter 13 case with prejudice is denied, but the case shall be converted to Chapter 7 as provided by § 1307(c), for cause. Creditor's objection to confirmation of Debtor's proposed Chapter 13 Plan is therefore moot.